**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 20-cv-25318-BLOOM/Otazo-Reyes**

BLUEGREEN VACATIONS UNLIMITED, INC.,
*et al.*,

Plaintiffs,

v.

TIMESHARE TERMINATION TEAM, LLC, *et al.*,

    Defendants.
_____/

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AGAINST DEFENDANTS TIMESHARE TERMINATION TEAM, LLC,
VINDALOO TRAVEL NETWORK, LLC, BRIAN WILBUR AND
HOLLY WILBUR ENJOINING THEM FROM DISSIPATING CERTAIN
ASSETS, AND, IN CONNECTION THEREWITH, FREEZING SUCH
ASSETS AND INCORPORATED MEMORANDUM OF LAW**

    Plaintiffs, Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation (collectively "Plaintiffs" or "Bluegreen"), respectfully move, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction enjoining Defendants Timeshare Termination Team, LLC (TTT-1), Vindaloo Travel Network, LLC (TTT-2), Brian Stephen Wilbur ("Brian"), and Holly Wilbur ("Holly") (Brian and Holly are collectively the "Wilburs") (all collectively, the "TTT Defendants") from dissipating certain assets.[1]

    Plaintiffs filed the Complaint in this case on December 30, 2020 and asserted various claims against the TTT Defendants, including a claim for False Advertising in violation of 15

---

[1] Pursuant to Local Rule(a)(2), a proposed order granting the requested injunction is attached hereto as **Exhibit A** and will be submitted via email to the Court as prescribed by Section 3I(6) of the CM/ECF Administrative Procedures.

1

U.S.C. § 1125 (the "Lanham Act"), and seek, *inter alia*, a permanent injunction and the equitable remedy of receiving the TTT Defendants' profits pursuant to 15 U.S.C. § 1117. *See* Complaint ¶¶ 179–88.[2] Recent documents produced by third party financial institutions confirm that the Wilburs, who own and control the TTT entities, are actively dissipating assets from TTT and placing them in their own name in a deliberate effort to frustrate and avoid the equitable relief sought by Plaintiffs. Under Eleventh Circuit precedent, "[a] request for equitable relief [under the Lanham Act] invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F. 3d 982, 987 (11th Cir. 1995).

Based on the undisputed facts, and controlling law, Plaintiffs respectfully request that the Court freeze the TTT Defendants' assets to ensure that Plaintiffs can obtain the equitable relief requested and to which they are entitled.[3] In support, Plaintiffs state as follows:

**I. FACTS AND BACKGROUND**

**A. Procedural History**

This case centers around a so-called timeshare "exit" scheme, whereby a group of companies and individuals, working in tandem, convinces timeshare owners—in this instance, Bluegreen Owners—to cease making payments on their valid timeshare contracts as part of an effort to "exit" those Owners from their contracts. Instead of succeeding in "exiting" or

---

[2] Around the time this lawsuit was filed, TTT-1 was administratively dissolved and TTT-2 changed its name to Timeshare Termination Team, LLC.

[3] Plaintiffs request that the Court freeze all of the TTT Defendants' assets and allow the TTT Defendants to petition the Court to modify the freeze to the extent the TTT Defendants have assets in excess of those that would be subject to disgorgement under the Lanham Act. *See Mycoskie, LLC v. Huangfen19790425*, 2016 WL 8740311, at *3 (S.D. Fla. Apr. 19, 2016), *aff'd*, 2016 WL 8716592 (S.D. Fla. Apr. 26, 2016).

cancelling the timeshare contracts, these timeshare-exit schemes result in defaults, injured credit scores, and significant unpaid debts owed to Bluegreen.

Plaintiffs filed their Complaint for Damages and Injunctive Relief on December 30, 2020. [ECF No. 1]. Plaintiffs allege, *inter alia*, that the TTT Defendants have engaged in false or misleading advertising in violation of the Lanham Act, tortious interference with contractual relations, civil conspiracy to engage in tortious interference, and unfair or deceptive trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). Compl. ¶¶ 178–298 [ECF No. 1].

The TTT Defendants were initially represented by Hogan Lovells US LLP, who mounted an incredibly aggressive defense. The TTT Defendants filed an Answer, Affirmative Defenses, and Counterclaim on April 12, 2021. [ECF No. 74].[4] In its Counterclaim, TTT-2 alleged that Bluegreen had engaged in false or misleading advertising in violation of the Lanham Act, tortious interference, and unfair or deceptive trade practices in violation of FDUTPA. *See* Counterclaim, ¶¶ 36–60 [ECF No. 74]. Bluegreen moved to dismiss TTT-2's Counterclaim on April 30, 2021. [ECF No. 88]. The Court held a hearing on Bluegreen's Motion on June 9, 2021, and dismissed TTT-2's Counterclaim without prejudice.[5] [ECF No. 112]. Thereafter, TTT-2 filed an Amended Counterclaim on June 14, 2021 [ECF No. 114]. Bluegreen moved to dismiss TTT-2's Amended Counterclaim on June 28, 2021. [ECF No. 124].

---

[4] The Counterclaim was filed only by TTT-2.

[5] Notably, during this hearing, when the Court asked TTT-2's counsel if there "[w]ere additional statements made about all timeshare exit companies or about TTT that have not been set forth in your counterclaim[,]" TTT-2's counsel stated, "Yes,. We could add additional statements beyond what's in there." *See* Transcript of June 9, 2021 Hearing at 19:15–19 (attached hereto as **Exhibit B**). As explained in Bluegreen's Motion to Dismiss the Amended Counterclaim [ECF No. 124], TTT-2 failed to present any such evidence and in fact chose not to replead one of its counterclaims altogether.

3

The next day, on June 29, 2021, Hogan Lovells moved to withdraw as counsel for the TTT Defendants, claiming that on June 24, 2021, it was informed that TTT-2 "had become insolvent, ceased operation, and that all of its employees were terminated." [ECF No. 125 ¶ 2]. Hogan Lovells alleged that it was owed $400,000 in legal fees and that the TTT Defendants are unable to and will not pay Hogan Lovells. *Id.* The Court granted the Motion to Withdraw on June 29, 2021. [ECF No. 126].[6] TTT-1 and TTT-2 failed to obtain new counsel by the deadline imposed by the Court. As a result, Bluegreen moved for the entry of a Clerk's default, which was granted. [ECF Nos. 145 and 146]. On August 13, the Wilburs notified the Court that they would be representing themselves *pro se.* [ECF Nos. 156 and 157].

### B. Discovery to Date Confirms the TTT Defendants' Fraud

Prior to allowing Hogan Lovells to withdraw, the Court required the production of documents from the TTT Defendants. [ECF Nos. 129 and 135]. Those documents and other evidence show that the TTT Defendants mislead and defraud consumers, as alleged in the Complaint.

- TTT-1/TTT-2 widely disseminate their claims that they have a "100% Money-Back Guarantee" and "100% Success Rate," as shown on their website (attached as Ex. 4 to the Complaint) and the advertisements attached as **Exhibit C** hereto.[7] TTT-1/TTT-2's sales consultants (dubbed "Expert Advisors") are also directed to

---

[6] Bluegreen moved the Court to reconsider its withdrawal order and asked the Court to require TTT Defendants' counsel to remain in the proceeding for the limited purpose of preserving and producing critical evidence. [ECF No. 128]. A series of motions were filed and the Court ultimately granted Bluegreen's request. [ECF No. 129 and 135]. Notably, these productions by Hogan Lovells were deficient and Plaintiffs have been diligently working to obtain all of the documents and information to which Plaintiffs are entitled.

[7] These advertisements represent only a small portion of the advertising that makes these false statements.

4

restate these claims to potential customers over the phone, as shown in the document attached as **Exhibit D**.

- As further evidence of the "100% Success Rate" claim, TTT Defendants instruct their sales staff to answer "Will I be completely released from all elements of my timeshare?" with "Yes." *See* **Exhibit E**.

- TTT-1/TTT-2 widely disseminate their claim that their timeshare exit process is "SAFE," "LEGAL," and "PERMANENT," as seen in the advertisement attached as **Exhibit F** and as shown below:



- The Wilburs personally appeared and participated in TTT Defendants' advertising, which include some of the false claims described above. *See* Mile High Living Advertising Segment (video to be entered at the evidentiary hearing).

- In at least one advertisement, TTT Defendants' sales consultant claims that TTT Defendants' attorneys will represent Owners in Court to get them out of their timeshare contracts. *See* Arizona Midday Advertising Segment (video to be entered at the evidentiary hearing).

5

But the sum and substance of TTT Defendants' timeshare exit "solution" is simply to instruct or advise customers to stop payments, as shown below:

- The sales consultant script encourages owners to stop their payments by informing them that other clients stop their payments and offering a credit protection service if their credit is impacted due to the stopped payments. *See* Ex. D.

- TTT-1/TTT-2 assumes, when training staff on handling owners with timeshare mortgages, that the owners will stop their payments. *See* **Exhibit G** ("Most clients are making monthly payments, which gives our attorneys a very small window in which to operate. Once payment is stopped, we typically have 90-days before timeshares will begin negative credit reporting or send the client into default . . . Most of our clients cannot make that financial commitment [to keep paying].").

- The Wilburs personally instruct and/or advise Bluegreen Owners to stop their payments. For example, in one e-mail exchange, Brian Wilbur tells an Owner "if you'd like to pay this that is up to you, but you really don't need to keep putting money into this timeshare since we are helping you get rid of it." **Exhibit H**. In another e-mail, Brian Wilbur says "[a]s Holly [Wilbur] mentioned on the phone today, there is no need to pay that additional $139 fee [to Bluegreen]." **Exhibit I**.

In truth, TTT Defendants do not have any legitimate process or method to get Bluegreen Owners (or any owners, for that matter) out of their timeshare contracts with Bluegreen. Instead, their only advice is to ask owners to stop making their payments. As one Bluegreen Owner aptly

6

put it, "The form letters [from TTT] never speak specifically about my loan and say nothing. They are so generally worded. I could have sent it myself." **Exhibit J**.[8]

But this "method"—defaulting on Owners contractual obligations—is not successful either. TTT Defendants cannot live up to their claims of a 100% success rate or a 100% money-back guarantee. As an internal TTT e-mail concluded, "[TTT] now ha[s] a significant number of clients beyond their 2-year mark which is unacceptable and puts our organization at risk in multiple ways. . . [W]e are receiving an increased number of requests for refunds and negative reviews online." **Exhibit K**. In another internal e-mail, TTT's CEO stated that "[t]he current unexited files represent $9,000,000 in unearned revenue for TTT" and that TTT's exit rate is only 7%. *See* **Exhibit L**. Nor does TTT give out refunds as promised, causing consumers to complain to TTT without any relief. *See* **Exhibit M**.

All of this evidence, taken together, establish that TTT's material advertising claims are actually false.

      **C.**      **TTT's Fraudulent Scheme Has Become National News**

Beyond the discovery in this case, which establishes the TTT Defendants' fraudulent scheme, news agencies across the country have investigated the TTT Defendants and confirmed that they have effectively vanished into thin air with their customers' money. For example, on August 11, 2021, Contact Denver7 published an article titled *Former Employee Speaks Out After Timeshare Termination Company Vanishes With Clients' Money*. A copy of the article is attached hereto as **Exhibit N**. Denver7 noted that "[a] former employee with the Timeshare Termination Team says she was just as shocked as clients when the company closed its office and vanished with people's hard-earned money." *Id.* Contact Denver7 further explained that it

---

[8] Instead of taking this owner's concerns seriously, TTT's employee simply said "Oh my smh. . . . Clients like this just aggravate me to my core." *Id.*

7

"began looking into Wilbur and went to his home in Douglas County. His wife said he was not home and refused to answer any questions about Timeshare Termination Team. She closed the door when Denver7's Liz Gelardi asked, 'What happened to all the money that people paid you?'" *Id.*

Likewise, KPRC in Houston, Texas published an article on August 11, 2021 titled *Timeshare Termination Company Disappears with Customers' Money*. A copy of the article is attached hereto as **Exhibit O**. That article explains that "dozens of people paid big money to a company that promised it could legally end their timeshare agreements. Once they paid, the company disappeared." *Id.*

Similarly, the Better Business Bureau has received numerous complaints about the TTT Defendants, noting that the TTT Defendants are no longer in business. A copy of the BBB website reflecting recent postings is attached hereto as **Exhibit P**.

### D. Financial Discovery Confirms That TTT Defendants Are Dissipating Assets

On or about August 2, 2012, Plaintiffs obtained documents from JP Morgan Chase Bank in response to a third-party subpoena relating to accounts owned by the TTT Defendants. Over the course of the entire period of TTT Defendants' business operations, the Wilburs have taken each and every opportunity to siphon hundreds of thousands, if not millions, of dollars into their personal accounts, with likely many of these assets still out of Plaintiffs' view. At the peak of TTT Defendants' business, hundreds of thousands of dollars per month were moving between multiple accounts, much of it ultimately landing in the Wilburs personal bank accounts and into other financial accounts beyond the purview of records garnered thus far.

For example, each month, TTT-1/TTT-2 would make multiple wire payments or business check transfers to a joint checking account operated by the Wilburs.[9] *See* **Exhibit Q**.[10] Almost immediately, large portions of these wire transfers were then transferred again via Zelle (a money transmitter service) to another account labeled "Holly Wilbur Personal." *See* **Exhibit R**.[11] These monthly insider transfers continued all the way up to and until the alleged "termination" of TTT Defendants' timeshare exit operation. *See* **Exhibit S**.[12] By June 30, 2021, despite apparently normal cashflows in TTT-1/TTT-2's business checking account, TTT Defendants completely liquidated this business account, bringing it to a balance of $0.00. *See* **Exhibit T**.[13] During this same month, TTT continued to receive monthly payments from customers, made its usual insider transfers to the Wilburs, and then abruptly liquidated the account. *Id.* In other words, the bank records have no business-oriented explanation why TTT Defendants would close their doors for business; their revenues were significant and their monthly profits were quite lucrative for the Wilburs.

Nonetheless, TTT Defendants have left timeshare owners high and dry. For example, customers ▇▇▇ and ▇▇▇▇▇ repeatedly asked TTT Defendants for a refund after their complete failure to take any action on their timeshare. *See* Ex. M. The ▇▇▇ sent multiple letters, including into July, seeking a refund from TTT Defendants. *Id*. Contrary to TTT

---

[9] These transfers were not payments facilitated through TTT Defendants' payroll system.

[10] Plaintiffs will introduce almost three years of bank records of TTT Defendants at the evidentiary hearing.

[11] Plaintiffs are pursuing these transfers via additional third-party discovery and will submit these records in the evidentiary hearing if they are available at that time.

[12] The Wilburs also appear to be diverting significant funds into a life insurance policy. *See id.*

[13] The Wilburs' personal checking account retained its usual balances even upon the liquidation of the business accounts.

Defendants' "100% Refund Guarantee," the ▮ have barely received any response. *Id.* In other words, TTT Defendants have chosen to hoard away the significant sums received by TTT for themselves instead of honoring the promises for refunds in their advertising. Now, consumers like the ▮ have little to no recourse because TTT Defendants' business accounts are at zero.

## II.  LEGAL STANDARD

"A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F. 3d 982, 987 (11th Cir. 1995). It is well-established that a request for disgorgement of profits under the Lanham Act constitutes relief in equity. *See id.*

"To obtain a preliminary injunction, a party must demonstrate '(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest.'" *Fendi S.R.L. v. Individuals, Partnerships & Unincorporated Ass'ns Identified on Schedule "A,"* 2021 WL 2580358, at *2 (S.D. Fla. Apr. 13, 2021) (quoting *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005)).

## III.  MEMORANDUM OF LAW

### A.  Plaintiffs have a substantial likelihood of success on the merits of their Lanham Act claim

To state a claim for false advertising under the Lanham Act, Plaintiffs must establish that: (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and

10

(5) the movant has been—or is likely to be—injured as a result of the false advertising. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). Plaintiffs are likely to establish each of these elements.

### 1. The TTT Defendants engaged in false advertising

Plaintiffs set forth detailed allegations regarding the numerous false advertisements used by the TTT Defendants, via their website and numerous online postings, videos, and paid radio and new segments. Complaint ¶¶ 100–60. These false statements include, *inter alia*, (1) that the TTT Defendants can "legally cancel your timeshare" (*id*. ¶ 107(a)), (2) that the TTT Defendants can "safely, legally, [and] permanently" terminate your timeshare (*id*. ¶ 107(d)), (3) that TTT Defendants have a 100% success rate (*id*. ¶ 109), (4) that the TTT Defendants will provide a "money-back exit guarantee" (*id*. ¶ 116), and (5) that the TTT Defendants have a "patented process" to get owners out of their timeshare contracts (*id*. ¶ 145). Moreover, Plaintiffs set forth, in detail, how the Wilburs participated in, and controlled, the false advertising. *See, e.g.,* Complaint ¶¶ 33, 63, 105, 107, 108, 110, 124, 127, 131, 141, 145, and 146.

Each of those statements is literally false because the TTT Defendants (1) have no way to legally cancel a timeshare contract; (2) did not "safely, legally, [and] permanently terminate" numerous timeshare contracts; (3) do not have a 100% success rate; (4) did not refund numerous customers; and (5) there is no patent on any of the TTT Defendants purported "processes."

Beyond the allegations, which are deemed admitted as result of the default against TTT-1 and TTT-2, the evidence to date establishes that the advertisements were in fact false. To be sure, as discussed above, the TTT Defendants effectively stole thousands, if not millions, from numerous consumers when they ostensibly shut down their operations. Additionally, the TTT Defendants have themselves produced email correspondence demonstrating that they have

11

numerous files that were not successfully resolved and that their exit rates are well below "industry standard expectations." A copy of such an email is attached hereto as Exhibit J.

Based on these undisputed facts, Plaintiffs are likely to establish that the TTT Defendants engaged in false advertising in violation of the Lanham Act.

### 2. The TTT Defendants' advertisements deceived consumers

As discussed above, the TTT Defendants' advertisements were literally false. Accordingly, Plaintiffs need not present evidence of consumer deception. *Osmose, Inc. v. Viance*, LLC, 612 F.3d 1298, 1319 (11th Cir. 2010) ("If the court deems an advertisement to be literally false, then the movant is not required to present evidence of consumer deception.")

### 3. The TTT Defendants' deceptive advertisements had a material effect on purchasing decisions

Plaintiffs can establish that the TTT Defendants' advertisements had a material effect on purchasing decisions by showing that "the defendants misrepresented an inherent quality or characteristic of the product." *Osmose*, 612 F.3d at 1319. The TTT Defendants repeatedly misrepresented their product, including most notably by claiming that they have a "patented process" that can "legally cancel your timeshare" with a 100% success rate.

### 4. The TTT Defendants' services affect interstate commerce

The TTT Defendants engaged in website advertisements, online video posting and nationwide radio and news advertisements. Moreover, the TTT Defendants are based in Colorado, whereas Plaintiffs are based in Florida. In addition, in 2020 alone, TTT Defendants advertised in 15 major media markets nationwide, including Tampa, Florida. *See* **Exhibit U**. There is no dispute that the TTT Defendants' services affected interstate commerce.

### 5. Plaintiffs were injured as a result of the TTT Defendants' false advertising

Plaintiffs have suffered monetary harm as a result of TTT Defendants' false advertising. Bluegreen Owners, after being lured to sign up with TTT Defendants' for timeshare exit services based on their representations of 100% success rate (and other false claims), stop payments on their timeshares that were owed to Bluegreen. For example, owners ▒▒▒ and ▒▒▒▒▒▒, stopped making their monthly payment to Bluegreen, which was due just five (5) days after the ▒▒▒▒▒▒ signed up with TTT Defendants. *See* Collective **Exhibit V**.[14] Bluegreen has never received another payment from the ▒▒▒▒▒▒. Likewise, ▒▒ and ▒▒▒▒▒▒, as well as ▒▒▒▒▒▒ and ▒▒▒▒▒▒, defaulted on their payments to Bluegreen within days of signing up with TTT Defendants. *See* Collective **Exhibits W** and **X**. These instances are just a sample of the sum total of Bluegreen Owners that defaulted on their payments to Bluegreen as a result of the false advertising disseminated to these Owners.

### B. Plaintiffs will suffer irreparable injury without a temporary injunction

As set forth above, Plaintiffs have a substantial likelihood of prevailing on their Lanham Act claim against the TTT Defendants, in which case Plaintiffs would be entitled, as an equitable remedy, to disgorgement of the profits the TTT Defendants' obtained through their improper conduct. *See* 15 U.S.C. § 1117. Numerous courts have recognized that, given the inherently deceptive nature of those who violate the Lanham Act, an injunction freezing assets is appropriate to ensure the availability of permanent relief. *See, e.g., Sportswear Co.- S.P.A. v. Act As Purchasing Agency*, 2021 WL 2666885, at *1 (N.D. Ga. Feb. 2, 2021) (granting temporary injunction to freeze assets "in order to assure the availability of permanent relief."); *Fendi*, 2021

---

[14] This collective exhibit shows Bluegreen's internal payment records, which show the ▒▒▒▒▒▒ last payment was due May 10, 2020. The ▒▒▒▒▒▒ signed up with TTT on May 5.

WL 2580358, at *3-4 (same); *St-Honore* v. Goyy, 2019 WL 7370409, at *2-3 (S.D. Fla. Sept. 24, 2019) (same). Here, there is no dispute, given the evidence, that the TTT Defendants have been and are already dissipating assets, and that absent an injunction, Plaintiffs will be left without the equitable remedy to which Plaintiffs are entitled.

### C. Plaintiffs' threatened injury outweighs the harm the temporary injunction would inflict on the TTT Defendants

Plaintiffs will be irreparably harmed absent an injunction. The TTT Defendants, on the other hand, will incur no cognizable injury if the Court freezes certain of their assets. If the TTT Defendants were operating a legitimate business, they undoubtedly would defend the allegations. Instead, the Wilburs have effectively acknowledged that the TTT entities have no defense, allowed them to default, and are now acting *pro se* to strategically prolong this litigation to permit further dissipation of assets. There is no injury in preventing the Wilburs, in concert with the TTT entities, from effectuating such a deceptive and fraudulent plan or in prohibiting the Wilburs from further use of funds that were obtained in violation of the Lanham Act.

### D. Granting the temporary injunction will benefit the public interest

The TTT Defendants operated a fraudulent business in violation of Federal law and amassed millions of dollars in profits by defrauding the public. The TTT entities are now putting forth no defense. Instead, the Wilburs, who control the TTT entities, are simply stripping the entities of ill-gotten gains for their own personal use. The public interest would be served by preventing further dissipation of assets pending a resolution of this case to ensure that the TTT Defendants do not continue to profit from their scheme through further fraudulent activity. Moreover, the requested injunction would also protect the customers of the TTT Defendants who may also seek legal relief against the TTT Defendants.

### E. The Court should require a bond of no more than $10,000.00

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The TTT Defendants are unlikely to sustain any meaningful costs or damages if it is ultimately determined that they have been wrongfully enjoined or restrained. None of the TTT Defendants are using any funds to put forth a legal defense in this case. Defaults have already been entered against the entity defendants and the Wilburs are proceeding *pro se*. In fact, according to former counsel for the TTT Defendants, the TTT Defendants still owe $400,000 in legal fees. [ECF No. 125 ¶ 2].

It is apparent that the TTT Defendants are not using their assets for legitimate purposes. The TTT Defendants will not suffer any damage if they are precluded from absconding with their ill-gotten gains prior to the resolution of this lawsuit. Notably, similar bonds have been approved in other cases where a Court entered an injunction to freeze assets that that are subject to disgorgement under the Lanham Act. *See, e.g., Fendi*, 2021 WL 2580358, at *5 (requiring $10,000 bond); *St-Honore*, 2019 WL 7370409, at *5 (same).

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that the Court: (1) grant this Motion; (2) enter a preliminary injunction in the form attached hereto as Exhibit A; and (3) granting such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

*/s/ Eric C. Christu*
**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
echristu@shutts.com

**SHUTTS & BOWEN, LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**MICHAEL QUINN, ESQ.**
Florida Bar No. 84587
mquinn@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of August, 2021, a true and correct copy of the foregoing has been electronically filed with the Clerk of Court using the Court's CM/ECF filing system, which will serve a copy via electronic mail upon the following CM/ECF Participants, and on the aforementioned date I caused a true and correct copy of the foregoing to be served via U.S. Mail, postage prepaid, or other similar courier service upon the following non-CM/ECF Participants:

| | |
|---|---|
| Omar M. Saleh, Esq. | Todd M. Hoepker, P.A. |
| Email: osaleh@floridalegalconsulting.com | Email: toddhoepker@hoepkerlaw.com |
| Omar M. Saleh | TODD M. HOEPKER, P.A. |
| Florida Legal Consulting, P.A. | Post Office Box 3311 |
| 9000 NW 44th Street, Suite 220 | Orlando, FL 32802 |
| Sunrise, FL 33351 | Telephone: (407) 426-2060 |
| Telephone: (954) 305-5454 | Facsimile: (407) 426-2066 |

16

| | |
|---|---|
| Facsimile: (954) 200-8755<br><br>*Attorney for Michael Molfetta and Molfetta Law, LLC* | *Attorney for Defendant Harold O. Miller* |
| Shannon L. Zetrouer, Esq.<br>Email: szetrouer@zp-legal.com<br>Secondary email: tpulsifer@zp-legal.com<br>Add'l Email: cos@zp-legal.com<br>Zetrouer Pulsifer, PLLC<br>3135 1st Ave N, #15549<br>St. Petersburg, FL 33733<br>Telephone: 727-440-4407<br><br>*Attorney for Shayna G. Schroeder and Systema Marketing, Inc.* | |

**NON-CM/ECF PARTICIPANTS**

| | |
|---|---|
| Jordan Salkin<br>1503 S. Coast Drive, Suite 202<br>Costa Mesa, CA 92626<br>PER COURT ORDER | Freedom Consumer Services LLC d/b/a<br>Timeshare Freedom Group<br>1503 S. Coast Drive, Suite 202<br>Costa Mesa, CA 92626<br>PER COURT ORDER |
| Brian and Holly Wilbur (Pro Se)<br>6511 N. Village Road<br>Parker, CO 80134<br>PER COURT ORDER | Timeshare Termination Team, LLC f/k/a<br>Vindaloo Travel Network, LLC d/b/a<br>Timeshare Termiantion Team<br>8300 E. Maplewood Avenue, Suite 300<br>Greenwood Village, CO 80111<br>PER COURT ORDER |
| Timeshare Termination Team LLC<br>12835 E. Arapahoe Road, Tower 1, Suite 500<br>Centennial, CL 80112<br>PER COURT ORDER | |

*/s/ Eric C. Christu*
**ERIC C. CHRISTU, ESQ.**

ORLDOCS 18924088 8

17